779 F.2d 497
 121 L.R.R.M. (BNA) 2276, 54 USLW 2361,
104 Lab.Cas. P 11,752,
106 Lab.Cas. P 12,234,
6 Employee Benefits Ca 2657
 LABORERS HEALTH AND WELFARE TRUST FUND FOR NORTHERN
CALIFORNIA; Laborers Pension Trust Fund for Northern
California; and Laborers Training and Retraining Trust Fund
for Northern California, Plaintiffs-Appellants,
v.
ADVANCED LIGHTWEIGHT CONCRETE CO., INC., Defendant-Appellee,
CEMENT MASONS HEALTH AND WELFARE TRUST FUND FOR NORTHERN
CALIFORNIA; Cement Masons Pension Trust Fund for Northern
California; Cement Masons Vacation Trust Fund for Northern
California; and Cement Masons Apprenticeship and Training
Trust Fund for Northern California, Plaintiffs-Appellants,
v.
ADVANCED LIGHTWEIGHT CONCRETE CO., INC., Defendant-Appellee.
 Nos. 84-2403 to 84-2406.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 8, 1985.
Decided Dec. 26, 1985.
 
 Barry E. Hinkle, Blythe Mickelson, Michael B. Roger, Van Bourg, Allen, Weinberg & Roger, San Francisco, Cal., for plaintiffs-appellants.
 Mark S. Ross, Schachter, Kristoff, Ross, Sprague & Curiale, San Francisco, Cal., for defendant-appellee.
 An Appeal From United States District Court for the District of California.
 Before CHAMBERS, TANG, and PREGERSON, Circuit Judges.
 PREGERSON, Circuit Judge:
 
 
 1
 In this case of first impression for an appellate court, we hold that the primary jurisdiction of the National Labor Relations Board preempts a trust fund's suit in district court under sections 502 and 515 of the Employee Retirement Income Security Act ("ERISA") to recover delinquent contributions accrued after a collective bargaining agreement has expired.
 
 FACTS
 
 2
 As a member of the Associated General Contractors of California ("AGC"), Advanced Lightweight Concrete Co. ("Advanced") was a signatory both to the 1980-83 Laborers Master Labor Agreement and to the 1980-83 Cement Masons Master Labor Agreement ("master agreements"). These multi-employer collective bargaining agreements included a requirement that Advanced contribute on behalf of its employees to: the Laborers Health and Welfare Trust Fund for Northern California; the Laborers Pension Trust Fund for Northern California; the Laborers Vacations-Holiday-Dues Trust Fund for Northern California; and the Laborers Training and Retraining Trust Funds for Northern California; and to the Cement Masons' Health and Welfare Trust Fund for Northern California; the Cement Masons Pension Trust Fund for Northern California; the Cement Masons Vacation-Holiday-Supplemental Dues Trust Fund for Northern California; and the Cement Masons Apprenticeship and Training Trust Fund for Northern California Fund ("trust funds"). The master agreements both incorporated the terms of the trusts by reference and specified the contributions due per employee hour worked from a signatory employer to the funds during the term of the agreement.
 
 
 3
 Before the expiration of the master agreements, Advanced withdrew AGC's authority to bargain on its behalf, and notified the Northern California District Council of Laborers of the Laborers International Union of North America AFL-CIO, the District Council of Plasterers and Cement Masons of Northern California, and the relevant local unions ("the unions") that it would not be bound by either the master agreements or any successor agreements beyond their June 15, 1983 expiration date. Advanced also declared to the unions its readiness to negotiate independently.
 
 
 4
 While the parties disagree as to the nature of further contacts between Advanced and the unions,[1] it is not disputed that Advanced has not signed any collective agreement with either the Laborers' or Cement Masons' unions. There is also no dispute that Advanced has paid no contributions to either trust fund since June 15, 1983.
 
 
 5
 In December 1983, the trust funds filed separate suits against Advanced seeking unpaid contributions from June 15, 1983. In March and April 1984, the trust funds filed two further complaints demanding an audit of Advanced's books in accordance with the terms of the master agreements.[2] The former cases alleged jurisdiction based on ERISA Sec. 502, 29 U.S.C. Sec. 1132, and Sec. 515, 29 U.S.C. Sec. 1145, and Labor Management Relations Act ("LMRA") Sec. 301, 29 U.S.C. Sec. 185. In May 1984, the four cases were consolidated as related cases under local rules.
 
 
 6
 Relying entirely on Cement Masons Health and Welfare Trust Fund for Northern California v. Kirkwood-Bly, Inc., 520 F.Supp. 942 (N.D.Cal.1981), aff'd for the reasons stated in the district court's opinion, 692 F.2d 641 (9th Cir.1982), the district court held that it had no jurisdiction over the four related suits and granted summary judgment to Advanced. Trust funds timely appealed.
 
 STANDARD OF REVIEW
 
 7
 A district court's determination that it is without subject matter jurisdiction is reviewed de novo. Fort Vancouver Plywood Co. v. United States, 747 F.2d 547, 549 (9th Cir.1984). In reviewing a district court's grant of summary judgment, all inferences from the evidence are viewed in the light most favorable to the party against whom summary judgment was granted. Twentieth Century-Fox Film Corp. v. MCA, Inc., 715 F.2d 1327, 1328-29 (9th Cir.1983).
 
 DISCUSSION
 A.
 
 8
 Freezing the status quo ante after a collective agreement has expired promotes industrial peace by fostering a non-coercive atmosphere that is conducive to serious negotiations on a new contract. Thus, an employer's failure to honor the terms and conditions of an expired collective bargaining agreement pending negotiations on a new agreement constitutes bad faith bargaining in breach of sections 8(a)(1), 8(a)(5) and 8(d) of the National Labor Relations Act ("NLRA"), 29 U.S.C. Secs. 158(a)(1), 158(a)(5) and 158(d). NLRB v. Katz, 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962). Consequently, any unilateral change by the employer in the pension fund arrangements provided by an expired agreement is an unfair labor practice. Peerless Roofing Co. v. NLRB, 641 F.2d 734, 736 (9th Cir.1981); Producer's Dairy Delivery Co. v. Western Conference of Teamsters Pension Trust Fund, 654 F.2d 625, 627 (9th Cir.1981). However, after bargaining to impasse,[3] the employer may unilaterally implement the best offer made in negotiations. Katz, 369 U.S. at 745, 82 S.Ct. at 1112.
 
 B.
 
 9
 In granting summary judgment, the district court relied on Cement Masons Health and Welfare Trust Fund for Northern California v. Kirkwood-Bly, Inc., 520 F.Supp. 942 (N.D.Cal.1981), aff'd for the reasons stated in the district court's opinion, 692 F.2d 641 (9th Cir.1982). In Kirkwood-Bly, a trust fund sued under section 301 of the LMRA to recover contributions due after a collective agreement had expired but before impasse. 520 F.Supp. at 943. The district court reasoned that a collective bargaining agreement does not "survive" in the sense that it continues as a legally operative document; rather, the agreement's terms "survive" in order to define the parameters of the employer's obligation under section 8(a)(5) to maintain the status quo during negotiations. 520 F.Supp. at 943-945. Thus, the NLRB's primary jurisdiction preempts a suit to enforce the terms of an expired collective agreement.[4]
 
 
 10
 The trust funds dispute the validity of Kirkwood-Bly to their suits. KirkwoodBly expressly does not decide any similar trust fund suit brought under section 515 of ERISA. 520 F.Supp. at 946 n. 2.[5] Moreover, in an opinion decided after the district court's grant of summary judgment to Advanced, Chief Judge Peckham, who wrote the district court opinion in Kirkwood-Bly, held that the NLRA does not preempt a section 515 suit to recover delinquent contributions due after the expiration of a collective bargaining agreement. Laborers Health and Welfare Trust Fund v. Hess, 594 F.Supp. 273, 282 (N.D.Cal.1984).[6] Kirkwood-Bly thus is not necessarily determinative of the trust funds' suits insofar as they are based on section 515 of ERISA. However, Kirkwood-Bly does, as both parties concede, mandate affirmance of summary judgment on the trust funds' section 301-based causes of action.
 
 C.
 
 11
 Section 515 of ERISA, 29 U.S.C. section 1145, states:
 
 
 12
 Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.
 
 
 13
 Section 515 was added to ERISA in 1980 by section 306(a) of the Multiemployer Pension Plan Amendment Act ("MPPAA")[7] to allow trust funds to recover delinquent contributions from employers as expeditiously as possible.[8]
 
 
 14
 In Hess, the court's conclusion that the NLRA does not preempt a section 515 suit after the collective agreement has expired relied heavily on statutory analysis. Based on this analysis, the court characterized the purpose of section 515 as remedial. Three other reported decisions have dealt explicitly with this issue subsequent to Hess, and all reach the opposite conclusion. Mo-Kan Teamsters Pension Fund v. Botsford Ready Mix Co., 605 F.Supp. 1441, 1444-48 (W.D.Mo.1985); U.A. 198 Health and Welfare Education and Pensions Funds v. Rester Refrigeration Service, Inc., 612 F.Supp. 1033, 1036-38 (M.D.La.1985); Pattern Makers' Pension Trust Fund v. Badger Pattern Works, Inc., 615 F.Supp. 792, 798-800 (N.D.Ill.1985).[9]
 
 
 15
 Hess rests on three premises. First, a phrase similar to "obligated to make contributions," which appears in section 515, is defined elsewhere in ERISA as "an obligation to contribute arising ... (1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law." 29 U.S.C. Sec. 1392(a). Subpart (2) of this definition would seem to include obligations created by section 8(a)(5). Since no other relevant definition appears in ERISA, Hess concludes that the phrase used in section 515 has a similarly broad scope. 594 F.Supp. at 279. Yet, as Botsford points out, the section 1392(a) definition expressly refers only to withdrawal liability.[10] 605 F.Supp. at 1445. Hence, a more plausible conclusion is that Congress intended withdrawal liability to be more broadly based than employer's general liability for ERISA violations.
 
 
 16
 Second, Hess observes that section 515 applies to employers who are "obligated to make contributions ... under the terms of a collectively bargained agreement", 594 F.Supp. at 279 (emphasis in original), and concludes that this specificity of phrase--and the absence of any other less precise phrase--suggests that section 8(a)(5) obligations were intended to fall within section 515. Id. We believe this conclusion to be incorrect. More persuasive is the similarity between the phraseology in section 515 and that in section 1392(a)(1) ("obligation to contribute arising ... under one or more collective bargaining ... agreements"), which would reinforce the conclusion that Congress intended section 515 liability to be less extensive than withdrawal liability. As Botsford properly observes, there is no reason to believe that Congress would use "an ambiguous, metaphysical concept to define an obligation [in section 515] when it has used a crystal clear definition elsewhere [in section 1392] in the same act." 605 F.Supp. at 1445.
 
 
 17
 Third, Hess notes that the Congressional sponsors' statements indicate that the purpose of section 515 was to limit drastically the defenses available to employers in delinquent contributions suits. 594 F.Supp. at 280-81.[11] Since the disapproved defenses could be asserted equally after an agreement has expired as before, Hess concludes that "it would make little sense to limit section 515 to actions involving obligations based on extant collective bargaining agreements." 594 F.Supp. at 281. Again the reasoning is unconvincing. No indication exists that, during its deliberations on the MPPAA, Congress even considered the problem of continuing obligations from expired agreements much less that it had a view on resolving any conflict between section 515 and the primary jurisdiction of the NLRB.[12]
 
 D.
 
 18
 Denying district court jurisdiction to the trust funds need not prejudice their claims against Advanced. There is no bar to the trust funds' filing an unfair labor practice charge against Advanced. 29 U.S.C. Sec. 160(b); 29 C.F.R. Sec. 102.9 ("A charge that any person has engaged in or is engaging in any unfair labor practice affecting commerce may be made by any person."); see Local Union No. 25, International Brotherhood of Teamsters v. New York, New Haven and Hartford Co., 350 U.S. 155, 160, 76 S.Ct. 227, 230, 100 L.Ed. 166 (1956) (railroad may file unfair labor practice charge); Plumbers and Steamfitters Local 298 v. County of Door, 359 U.S. 354, 357-58, 79 S.Ct. 844, 846, 3 L.Ed.2d 872 (1959) (county may file charge); Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc., 690 F.2d 489, 515-17 n. 11 (5th Cir.1982), cert. denied, 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983) ("[A]ny person, even a stranger to the collective bargaining agreement, can bring unfair labor practice charges.").[13] The dismissal of the unions' charge against Advanced, see note 1 supra, does not prevent the trust funds filing a separate charge: the unions' charge does not refer to a failure to pay trust fund contributions and in denying the complaint, the NLRB stated: "This office will fully investigate any future charge in this matter ... subject to the six month limitation period under Section 10(b) of the Act."[14]
 
 E.
 
 19
 The lack of useful statutory or Congressional guidance on section 515 requires that the matter be decided by the application of accepted labor law principles. When presented with a dispute that involves adjudicating conduct which "is arguably within the compass of Sec. 7 or Sec. 8 of the NLRA," a federal court must defer to the primary jurisdiction of the NLRB. San Diego Building Trades Council v. Garmon, 359 U.S. 236, 245, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959). "The desire to protect the primary jurisdiction of the NLRB flows from the need to maintain centralized administration of the NLRA by a specialized agency. Labor law involves many difficult questions of policy best left to the agency that has the expertise needed to solve them. Thus, the courts have traditionally shown great deference to the NLRB." Burke v. French Equipment Rental, Inc., 687 F.2d 307, 311 (9th Cir.1982). See also Glaziers & Glassworkers Local Union No. 767 v. Custom Auto Glass Distributors, 689 F.2d 1339, 1342 (9th Cir.1982) (Congress intended matters of national labor policy to be decided first by NLRB).
 
 
 20
 In Kirkwood-Bly, the Ninth Circuit concluded that an employer's duty to pay trust fund contributions after a collective agreement has expired derives entirely from section 8(a)(5) and that a section 301 suit to recover unpaid contributions between expiration and impasse was preempted. 692 F.2d 641 (9th Cir.1982), affirming, 520 F.Supp. at 944-45. The Kirkwood-Bly logic is equally persuasive in an ERISA-based suit. As with the employer in Kirkwood-Bly, Advanced's failure to pay contributions after the master agreements' expiration is, at least, an arguable unfair labor practice. While admittedly the failure to pay may also violate section 515 of ERISA, adjudication of the merits depends entirely on the section 8(a)(5) determination. Without a section 8(a)(5) violation, there is no section 515 infraction. Making this underlying labor law determination is exclusively an NLRB matter.[15]
 
 
 21
 We find no persuasive evidence in either the plain words or legislative history of ERISA or the MPPAA that Congress intended section 515 to be an exception to the general rule of NLRB preemption for that narrow category of suits seeking recovery of unpaid contributions accrued during the period between contract expiration and impasse. Therefore, the district court's grant of summary judgment to Advanced must be affirmed.
 
 
 
 [1]
 Advanced's brief states: "Neither the Laborers' nor the Cement Masons' unions made any attempt to commence collective bargaining negotiations with the Company."
 The Trust Funds' brief states: "Collective bargaining negotiations occurred between the Laborers Union and Advanced Lightweight after April 1, 1983."
 On November 3, 1983, the Northern California District Council of Laborers filed an unfair labor practice charge against Advanced with the National Labor Relations Board ("NLRB") alleging a failure to bargain in good faith. No. 32-CA-6027. On November 28, 1983, the Regional Director refused to issue a complaint, noting the union's failure to provide any timely supporting documentary evidence. On December 30, 1983, the NLRB Office of Appeals denied the union's appeal. The record shows that at least one meeting occurred between Advanced and Laborers' representatives on December 29, 1983.
 
 
 [2]
 Both master agreements, in essentially similar terms, require a signatory employer to submit to an audit by the trust funds in order to enforce the contributions requirements in the agreements. Both funds wrote to Advanced seeking audits immediately following the filing of the first pair of suits. Advanced consented to audits only up to June 15, 1983 claiming that it was not bound by the audit provision beyond the expiration of the master agreements. No audits have ever been made
 
 
 [3]
 "Impasse" is an imprecise term of art:
 The definition of an "impasse" is understandable enough--that point at which the parties have exhausted the prospects of concluding an agreement and further discussions would be fruitless--but its application can be difficult. Given the many factors commonly itemized by the Board and courts in impasse cases, perhaps all that can be said with confidence is that an impasse is a "state of facts in which the parties, despite the best of faith, are simply deadlocked." The Board and courts look to such matters as the number of meetings between the company and the union, the length of those meetings and the period of time that has transpired between the start of negotiations and their breaking off. There is no magic number of meetings, hours or weeks which will reliably determine when an impasse has occurred.
 R. Gorman, Basic Text on Labor Law, Unionization and Collective Bargaining 448 (1976) (citation omitted). See also H & D Inc. v. NLRB, 665 F.2d 257, 259-60 (9th Cir.1980), rev'd on other grounds, 455 U.S. 902, 102 S.Ct. 1243, 71 L.Ed.2d 440 (1982).
 
 
 [4]
 "As a general rule, federal courts do not have jurisdiction over activity which 'is arguably subject to Sec. 7 or Sec. 8 of the [NLRA],' and they 'must defer to the exclusive competence of the National Labor Relations Board.' " Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 83, 102 S.Ct. 851, 859, 70 L.Ed.2d 833 (1982) (quoting San Diego Building Trades Council v. Garmon, 359 U.S. 236, 245, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959) (citing Garner v. Teamsters, 346 U.S. 485, 490-91, 74 S.Ct. 161, 165-66, 98 L.Ed. 228 (1953)).)
 A panel of this court summarily affirmed in Kirkwood-Bly, 692 F.2d 741 (9th Cir.1982), and later reaffirmed the Kirkwood-Bly reasoning in the context of subsequent Supreme Court decisions. George Day Construction Co. v. United Brotherhood of Carpenters and Joiners, 722 F.2d 1471, 1481 (9th Cir.1984).
 
 
 [5]
 "Plaintiffs do not argue that defendants have violated section 515 of ERISA, 29 U.S.C. Sec. 1145.... In fact, plaintiffs do not allege any ERISA violation or that ERISA can provide an alternate basis for jurisdiction." 510 F.Supp. at 946 n. 2
 
 
 [6]
 Hess was subsequently dismissed by stipulation of the parties
 In the district court, the trust funds relied on I.A.M. National Pension Fund v. Schulze Tool and Die Co., 564 F.Supp. 1285 (N.D.Cal.1983). In Schulze, the employer made fund contributions after the expiration of the collective agreement, and then ceased payments. 564 F.Supp. at 1288. The court rejected the trust fund's Sec. 515 claim for delinquent contributions finding that impasse had been reached, thus relieving Schulze of any outstanding obligation to the fund. Id. at 1297-98. In Hess, Judge Peckham refused to regard Schulze as determinative authority: "By assessing the merits of the claim for unpaid contributions, the court implicitly held that it had jurisdiction over the claim. But the court did not explicitly discuss the question of jurisdiction in its opinion." 594 F.Supp. at 279. The district court's decision to resolve the impasse issue in Schulze is clearly at odds with our conclusion here that the primary jurisdiction of the NLRB preempts a Sec. 515 suit to recover unpaid contributions after a collective agreement has expired.
 
 
 [7]
 Pub.L. 96-364, 94 Stat. 1295, 29 U.S.C. Sec. 1132 et seq
 Section 515, in common with other ERISA provisions, is enforced via Sec. 502(a)(3) of ERISA, 29 U.S.C. Sec. 1132(a)(3):
 A civil action may be brought--
 * * *
 (3) by a participant, beneficiary or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.
 
 
 [8]
 Recourse available under current law for collecting delinquent contributions is insufficient and unnecessarily cumbersome and costly. Some simple collection actions brought by plan trustees have been converted into lengthy, costly, and complex litigation concerning claims and defenses unrelated to the employer's promise and the plan's entitlement to the contributions. This should not be the case. Federal pension law must permit trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor-management relations law--other than 29 U.S.C. 186. Sound national pension policy demands that employers who enter into agreements providing for pension contributions not be permitted to repudiate their pension promises.... [T]his legislation is intended to clarify the law ... by providing a direct, unambiguous ERISA cause of action to a plan against a delinquent employer
 
 
 [126]
 Cong.Rec. 23039 (1980) (statement of Rep. Thompson); id. at 23288 (statement of Sen. Williams). See also Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 86-88, 102 S.Ct. 851, 861-62, 70 L.Ed.2d 833 (1982); id. at 91-97, 102 S.Ct. at 864-66 (Brennan J. dissenting)
 
 
 [9]
 The trust fund in Botsford has not appealed the dismissal of its suit. Both Rester and Badger adopt the Botsford reasoning over Hess without themselves reviewing the issues in detail. In Badger, the court found an alternative ground for jurisdiction under ERISA Sec. 502. Badger 615 F.Supp. at 800-02. The employer had signed, as a term of the expired collective agreement, a supplemental agreement with the trust fund committing itself to contribute to the funds "until written notice revoking this Agreement is given to the Trust." Id. at 796-97. Badger 's failure to revoke this supplemental agreement until many months after the collective agreement had expired made it liable to the trust fund for delinquent contributions between expiration and revocation. Id. at 801-02. There is no evidence in the record of any supplemental agreement between Advanced and the trust funds. The actual trust agreements are not part of this record, but they must also be assumed not to provide the trust funds with any basis of recovery other than Sec. 515
 
 
 [10]
 Section 1392(a) begins: "For purposes of this part, the term 'obligation to contribute' means...." This clearly refers to Part I ("Employer Withdrawals") of Subtitle E ("Special Provisions for Multiemployer Plans") within Subchapter III ("Plan Termination Insurance") of ERISA. Section 515 is in Part 5 ("Administration and Enforcement") of Subtitle B ("Regulatory Provisions") within Subchapter I ("Protection of Employee Benefit Rights.") As the court noted in Hess: "Withdrawal liability is something quite different from regular fringe benefit contributions." 594 F.Supp. at 279 n. 6
 
 
 [11]
 See 126 Cong.Rec. 23039 (statement of Rep. Thompson); id. at 23288 (statement of Sen. Williams) & n. 10 supra. The Supreme Court has reached a similar conclusion: Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 88, 102 S.Ct. 851, 862, 70 L.Ed.2d 833 (1982). See also Southern California Retail Clerks Union and Food Employers Joint Pension Trust Fund v. Bjorklund, 728 F.2d 1262, 1265-66 (9th Cir.1984)
 
 
 [12]
 Advanced refers to a staff report to the responsible Senate Committee which states that Sec. 515's purpose was to avoid "complex litigation concerning claims and defenses unrelated to the employer's promise and the Plan's entitlement to the contributions." Senate Committee on Labor and Human Resources, 96 Cong., 2d Sess. 44 (Comm.Print 1980). Advanced asserts that this demonstrates Congressional intent to limit Sec. 515 to pure contractual obligations not obligations continued by the mandates of other statutes. A contrary interpretation of Congressional intent might be gleaned from a statement of both sponsors of the bill: "The bill imposes a Federal statutory duty to contribute on employers that are already obligated to make contributions to multiemployer plans." 126 Cong.Rec. 23039 (statement of Rep. Thompson): id. at 23,288 (statement of Sen. Williams). This statement may suggest that the source of the employer's obligation is irrelevant to his duty to contribute
 Both analyses are plausible, especially when the highlighted phrases are examined out of context. In truth, no conclusion concerning Congressional intent over the availability of Sec. 515 in a situation such as this could be proper given the absence of any indication that Congress was aware of the potential for conflict between Sec. 515 and Secs. 7 and 8 of the NLRA.
 
 
 [13]
 The assertion in Botsford that a trust fund has no standing to file Sec. 8(a)(5) charges is therefore wrong. 605 F.Supp. at 1447. Were the trust funds absolutely barred, procedurally or otherwise, from any remedy against Advanced except at the instigation of the unions, an alternative result granting jurisdiction to the district court might be justified. This circuit has permitted a trust fund to proceed to trial on the merits in an ERISA enforcement action duplicating NLRA matters "where the injured party bringing the suit has no acceptable means to invoke the Board's jurisdiction and cannot induce its adversary to do so." Laborers Health and Welfare Trust Fund v. Kaufman & Broad, 707 F.2d 412, 415-16 (9th Cir.1983). See also Operating Engineers Pension Trust v. Beck Engineering and Surveying Co., 746 F.2d 557, 565 (9th Cir.1984) (extending Kaufman to defenses which cannot be presented to the Board); Sears, Roebuck & Co. v. San Diego County District Council of Carpenters, 436 U.S. 180, 201-02, 98 S.Ct. 1745, 1759-60, 56 L.Ed.2d 209 (1978) (state court not necessarily preempted if no other forum available)
 The availability of an NLRB remedy to the trust funds obviates any potential fiduciary liability of the trustees to the fund beneficiaries caused by the dismissal of the Sec. 515 suit. See Rosen v. Hotel and Restaurant Employees and Bartenders Union, 637 F.2d 592, 600 (3d Cir.1981), cert. denied, 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1982); Kaufman, 707 F.2d at 416. Similarly, the trust funds' ability to prosecute their claim in an alternative forum makes it unnecessary to consider the applicability here of the distinctions between the rights of trustees of a fund benefitting from a collective agreement and the rights of a union under the same agreement noted in Robbins v. Prosser's Moving and Storage Co., 700 F.2d 433, 439-41 (8th Cir.1983) (en banc), aff'd sub nom. Schneider Moving and Storage Co. v. Robbins, 466 U.S. 364, 104 S.Ct. 1844, 80 L.Ed.2d 366 (1984).
 
 
 [14]
 At oral argument, counsel for the trust funds claimed that any NLRB charge by the funds against Advanced would be time-barred. If the funds' assertion that no impasse has yet been reached between Advanced and the unions is correct, Advanced's violation of Sec. 8(a)(5) would be continuing, and thus a charge by the funds would be timely
 
 
 [15]
 See Milk Drivers and Dairy Employees Union, Teamsters Local 302 v. Vevoda, 772 F.2d 530, 533 (9th Cir.1985) (defendants' defense that union shop clause did not require union membership preempted by NLRB's primary jurisdiction); Arizona Laborers, Teamsters and Cement Masons Local 495 Health and Welfare Trust Fund v. Conquer Cartage Co., 753 F.2d 1512, 1515-17 & n. 7 (9th Cir.1985) (trust fund's defense, that the employer's failure to give the requisite 60 days notice of termination under NLRA Sec. 8(d)(1) prevented the employer from claiming the expiration of the collective bargaining agreement, was preempted: "Because this argument is based entirely on the allegation that the employer committed an unfair labor practice under the NLRA, we lack jurisdiction to address its merits." Id. at 1516)
 Advanced asserts that impasse was reached, or, if not, that the unions waived their bargaining rights, thus permitting Advanced to make unilateral changes in working conditions, but admits that the NLRB has never accepted this argument. Advanced suggests that since the duty to bargain in good faith created by Sec. 8(d) of the NLRA is mutual, a union that breaches this duty should not be permitted to complain about the employer's unilateral changes in working conditions. Determining the merits of this argument is initially a matter for the NLRB. We, however, note that Advanced concededly made no payments after the day of expiration of the collective agreement. Since Advanced apparently breached Secs. 8(d) and 8(a)(5) before the unions can possibly have waived their rights, it seems unlikely that Advanced could successfully defend a properly documented unfair labor practice charge. See Katz, 369 U.S. at 741-42, 82 S.Ct. at 1110-11.